UNITED STATES DISTRICT COURT
DISTRICT OF PUERTO RICO

OMAYRA MULERO CARRILLO, et al.,,

   Plaintiffs,

   v.

ALEJANDRO ROMAN-HERNANDEZ, et al.,

   Defendants.

Civil No. 12-1095 (JAF)

**OPINION AND ORDER**

We must decide whether a Commonwealth regulatory scheme governing medical licensing violates the equal protection and due process rights of foreign-educated medical students.

**I.**

**Background**

An agency of the Commonwealth of Puerto Rico, the Puerto Rico Medical Discipline and Licensure Board regulates the practice of medicine in Puerto Rico. P.R. Laws Ann., Tit. 20, §132d(1). In pursuing this goal, the Board may: deny, suspend, or revoke any medical license; evaluate the medical education of prospective candidates for licensure; select and administer licensure examinations; and establish the grade required to pass the examination for licensure. Id.

The plaintiffs, American citizens and graduates of medical schools in Mexico and The Dominican Republic, (Docket No. 25 at 3-9.), allege that the defendants' application

1  of the Medical Discipline and Licensure Board Act, Act No. 139 of August 1, 2008,

2  violates their rights under the United States Constitution and the Constitution of Puerto

3  Rico because the Board has required students from foreign medical schools to achieve a

4  test score that the plaintiffs allege is more rigorous than the score required of students at

5  domestic medical schools.  (Docket No. 25 at 2, 40.)

6         The complaint and motion to dismiss refer to two separate tests: The Puerto Rico

7  Medical License Examination and the United States Medical Licensing Examination.

8  (Docket No. 25, 30.)  The United States Exam is administered and scored by the National

9  Board of Medical Examiners.  (Id.)  Passage of the United States exam enables applicants

10 access to practice medicine in the whole United States.  Passage of the Puerto Rico exam,

11 which is validated and calibrated by the National Board of Medical Examiners, allows

12 applicants access to the practice of medicine only in the Commonwealth of Puerto Rico.

13 The passing score for the Puerto Rico exam is applicable to all test takers—regardless of

14 where they received their medical education.  (Docket No. 30 at 13.)  While the plaintiffs

15 could have chosen to take the United States exam, (Docket No. 30 at 10), the Plaintiffs

16 took the Puerto Rico Medical Licensing Examination.  (Docket No. 25 at 1.)

17        In their amended complaint, the plaintiffs note that Act 139 provides: "The Board

18 shall establish the grade required to pass the examinations."  (Docket No. 25 at 13.)  The

19 plaintiffs go on to explain that "[t]he NBME has calibrated and validated the medical

20 examination it prepares.  The NBME procedure establishes a passing score for its

21 examination that from the data provided results in an average mean of 500 points."

22 (Docket No. 25 at 14.)  Ostensibly, the plaintiffs are referring to the United States exam

when they refer to the National Board of Medical Examiners validating, calibrating, and establishing a score for "its" examination. The plaintiffs then state that the Board "disregards the NBME's approval grade, and arbitrarily imposes instead a passing score of 700 points." (Id.) Here, we presume that the plaintiffs are referring to the Puerto Rico exam. The plaintiffs suggest that if the Board "had applied the NBME's approval score instead of its arbitrarily selected passing score of 700 points, all the Plaintiffs would have passed the first or second part of the PR medical license examination." (Docket No. 25 at 15.)

We understand the plaintiffs to suggest, then, that the Board ought to apply the 500-point passing score of the United States exam to the Puerto Rico exam. That is, apply the passing score of one test to an entirely different standardized test. The plaintiffs argue that because the Board did not apply the passing score of a different test to the test they took, the Board has "arbitrarily chosen a higher passing score" to exclude "applicants that study in international schools." (Docket No. 25 at 15.)

The plaintiffs filed an amended complaint on May 2, 2012. On May 9, 2012, the defendants moved to dismiss. On October 9, 2012, we granted the Defendants' motion for joinder. Accordingly, the assertions made originally made by Dr. Román-Hernández in his motion to dismiss are now applicable to all of the defendants. (Docket No. 60).

## II.

## **Legal Standard**

**A.   Motion to Dismiss Standard**

A plaintiff's complaint will survive a motion to dismiss if it alleges sufficient facts to establish a plausible claim for relief.  See Fed.R.Civ.P. 12(b)(6); Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  In assessing a claim's plausibility, the court must construe the complaint in the plaintiff's favor, accept all non-conclusory allegations as true, and draw any reasonable inferences in favor of the plaintiff.  San Geronimo Caribe Project, Inc. v. Acevedo-Vila, 687 F.3d 465, 471 (1st Cir. 2012) (citation omitted).

## III.

## **Discussion**

**A.   Plaintiffs Fail to State a Claim**

In their amended motion to dismiss, the defendants argue that plaintiffs have not asserted cognizable equal protection or due process claims under the United States Constitution or the Constitution of Puerto Rico.  (Docket No. 30 at 2.)  We agree.

A plaintiff cannot overcome a Rule 12(b)(6) motion to dismiss simply by referring to conclusory allegations in the complaint that the defendant violated the law.  Instead, the sufficiency of a complaint must "raise a right to relief above the speculative level", Twombly, 550 U.S. at 555, and demonstrate the plausibility of entitlement to relief.  Id. at 567.

Set alongside these requirements, the plaintiffs' complaint comes up short. The plaintiffs do not argue they are part of a suspect class deserving strict scrutiny review— nor could they. Taken as a class the plaintiffs are not defined by race, ethnicity, or national origin, but merely by the location of their education—which is not a classification recognized by the Supreme Court. See, e.g., Clark v. Jeter, 486 U.S. 456, 461 (1988) (Strict scrutiny is reserved for state "classifications based on race or national origin and classifications affecting fundamental rights.").

Therefore, rational basis review is appropriate. City of New Orleans v. Dukes, 427 U.S. 297, 303 (1976). Under the rational basis test, we presume that the classification is constitutional, and the plaintiffs bear the burden of demonstrating that the classification at issue furthers no legitimate public interest. Minnesota v. Clover Leaf Creamery Co., 449 U.S. 456, 465-66 (1981). There is no question that a legitimate state interest is at stake here: The minimum education standards established by the Board, including the passing score on the standardized examination, are designed to protect the public from unqualified medical practitioners. Indeed, Puerto Rico enacted Law 139 in response to a scandal in which a federal grand jury indicted one-hundred and ten doctors because personnel from the Commonwealth's previous medical licensing board allegedly altered low-scoring tests to certify unqualified candidates and grant them medical licenses. The doctors, mostly Puerto Ricans who studied medicine in the Dominican Republic, Mexico or Cuba, paid bribes to board members or employees of as much as $10,000 for test answers and fraudulent rescoring of exams. The doctors indicted (many of whom plead guilty or were convicted) were practicing medicine in Puerto Rico, including at hospitals

or emergency rooms, without having passed any exam to ensure their adequate education, thus defrauding the Commonwealth's healthcare programs and the patients who trusted their lives to these doctors.  Many of the indicted doctors, in fact, failed the licensing exam multiple times. One man earned a medical degree in Spain and failed the exam sixteen times between 1974 and 2001 before the Board granted him a medical license in 2002, according to the indictment.  See, e.g., U.S. v. Rodriguez-Torres, 560 F.Supp.2d 108, 110 (D.P.R. 2008.)   The plaintiffs' complaint does not plausibly indicate that the passing score the Board established is irrational or discriminatory.

Even if we granted the plaintiffs' inference, that setting the score on the Puerto Rican Exam targets students of foreign schools because those students more often take that test, that classification would still pass constitutional muster. The factual allegations alleged by the plaintiffs do not support a plausible equal protection violation.  That the plaintiffs studied at foreign medical schools does not by itself permit the inference that setting a particular qualifying score for licensing purposes violates equal protection. Instead, the central issue is whether there exists a difference between students who graduate from domestic medical schools and those who graduate from foreign medical schools that could be the basis for the classification made by the legislature.  We think such a difference exists.  The Board could have concluded, for example, that the process of accreditation required of domestic medical schools provides some guarantee that a school will provide a coherent course of medical education.  A degree conferred by a foreign medical school carries no such guarantee.  Even if the Board decided to impose additional educational requirements on graduates of foreign medical schools, it would be

permissible, because it would further the goal of ensuring that applicants' educational background qualified them to practice medicine in the Commonwealth. This is a reasonable justification.

The plaintiffs' contention that the Board lacks a sufficient statistical basis for the established passing score does not tip the scales. The Board does not need statistical support for the establishment of a passing score so long as the score is rationally related to a legitimate government purpose. Medeiros v. Vincent, 431 F.3d 25, 31 (1st Cir. 2005) ("Reviewing court must uphold the statute or regulation even in cases where there is no empirical data in the record to support the assumptions underlying the chosen remedy.").

**B.     Federal Law Claims Against Board Members in their Official Capacities**

Defendants argue that because the Board is "an arm of the Commonwealth" they are entitled to Eleventh Amendment immunity in their official capacities. (Docket No. 30 at 17-18.) We agree.

The Eleventh Amendment of the United States Constitution bars suits in federal courts by private parties seeking damages that would be paid from the state treasury. Quern v. Jordan, 440 U.S. 332, 337 (1979). Unless the state consents to be sued, the Eleventh Amendment proscribes suits against a state or one of its departments. Pennhurst State School & Hospital v. Halderman, 465 U.S. 89, 100 (1984). Immunity extends to state agencies and their officials when the agency or institution is characterized as an arm or alter ego of the state or when it should be treated instead as a political subdivision of the state. Mt. Healthy City School Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 280

(1977); see also Frensenius Medical Care Cardiovascular Resources, Inc. v. Puerto Rico and Caribbean Cardiovascular Center Corp., 322 F.3d 56, 63 (1st Cir. 2003) (twin goals of the Eleventh Amendment—protection of the state's treasury and of its dignitary interests—explicitly govern the arm-of-the-state analysis.). The Commonwealth of Puerto Rico enjoys the protection of the Eleventh Amendment. See Maysonet-Robles v. Cabrero, 323 F.3d 43, 53 (1st Cir.2003).

Furthermore, the Supreme Court has decided that neither a state nor its agencies are "persons" susceptible to being sued under Section 1983. Will v. Michigan Department of State Police, 491 U.S. 58, 71 (1989); Quern, 440 U.S. at 339–42.

In a prior case, this district court has held that the Eleventh Amendment protects the Board from suit because it is an arm of the Commonwealth. Gonzalez-Droz v. Gonzalez-Colon, 717 F. Supp. 2d 196, 207 (D.P.R. 2010). And since a suit against any member of the board in his official capacity is the same thing as a suit against the Board, these claims fail based on the sovereign immunity protection of the Eleventh Amendment. Thus, all claims against the Board and the defendants in their official capacities must be dismissed.

**C.     Federal Law Claims Against Board Members in their Individual Capacities**

The plaintiffs also sue the Board members in their individual capacities claiming they have violated the plaintiffs' equal protection rights by setting allegedly unfair requirements that disproportionately affect medical license applicants who received their degrees outside of the United States. In defense, the Board members claim qualified immunity. We address this argument alternatively to the holding above. Assuming

*arguendo* that the plaintiffs have stated a valid claim for relief, we deny that claim because the defendants are entitled to qualified immunity.

Qualified immunity shields government from liability for civil damages so long as "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). The qualified immunity inquiry is two-pronged. We must ask whether the official conduct violated a constitutional right and, if so, whether the right was clearly established at the time of the alleged misconduct. Pearson v. Callahan, 555 U.S. 223, 236 (2009). We may conduct this two-pronged inquiry in any order. Id.

For a constitutional right to be clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Anderson v. Creighton, 483 U.S. 635, 640 (1987). The First Circuit has constructed an analytical framework consisting of three inquiries: "(i) whether the plaintiff's allegations, if true, establish a constitutional violation; (ii) whether the constitutional right at issue was clearly established at the time of the putative violation; and (iii) whether a reasonable [official], situated similarly to the defendant, would have understood the challenged act or omission to contravene the discerned constitutional right." Limone v. Condon, 372 F.3d 39, 44 (1st Cir.2004).

Here, our inquiry need go no further than the first step of the sequence. To prevail on their equal protection claim, the plaintiffs must either allege membership in a protected class entitled to strict scrutiny or face the difficult burden of showing that the defendants lacked any rational basis for their actions. The plaintiffs fail on both fronts.

First, the plaintiffs' make no assertion that they belong to a suspect class, because they cannot. A suspect class is "a class of persons characterized by some unpopular trait or affiliation ... [that would] reflect any special likelihood of bias [against them] on the part of the ruling majority." See Mills v. State of Me., 118 F.3d 37, 47 (1st Cir.1997). The Supreme Court has recognized only race and national origin as suspect classes. Gender classifications are not inherently suspect, but do receive heightened scrutiny. Foreign-educated medical students, however, do not.

The plaintiffs, then, must prove that the defendants had no rational basis for their actions because "legislation or regulation which neither employs a suspect classification nor impairs fundamental rights will survive constitutional scrutiny, provided the remedy is 'rationally related' to a legitimate governmental purpose." Medeiros, 431 F.3d at 29 (1st Cir. 2005). We must reject the plaintiffs' claim as long as "any reasonably conceivable state of facts [ ] could provide a rational basis" for the challenged law. FCC v. Beach Commc'ns, Inc., 508 U.S. 307, 313 (1993).

Here, the Commonwealth of Puerto Rico has a clear justification – and thus, a rational basis – for requiring certain qualifications from those who wish to practice medicine. See Watson v. Maryland, 218 U.S. 173, 177 (1910) ("It is too well settled to require discussion at this day that the police power of the states extends to the regulation of certain trades and callings, particularly those which closely concern the public health."). Calibrating qualifying standards to the varying educational background of applicants is undoubtedly rational. The defendants are responsible for ensuring basic standards of quality in the medical profession. In doing so, they may make

classifications. Those classifications may be more or less capable of furthering the goal of safe medical practice. But the efficacy of the classifications is not a constitutional question – especially given that here no classification depends on a suspect class. See Nordlinger v. Hahn, 505 U.S. 1, 10 (1992) ("The Equal Protection Clause does not forbid classifications. It simply keeps governmental decision makers from treating differently persons who are in all relevant respects alike."). The classification must merely be rational, and this one surely is.

Having failed to demonstrate a clearly-established constitutional right, the plaintiffs' claim founders against the protection of the defendants' qualified immunity. In response, the plaintiffs claim the defendants lacked a rational basis for setting different requirements for students who attended foreign medical schools because no statistical evidence supports the Board's standards. But the government is not required to substantiate its reasoning with facts. Hughes v. Alexandria Scrap Corp., 426 U.S. 794, 812 (1976) ("The State is not compelled to verify *logical* assumptions with statistical evidence."). Further, a statute "need not be in every respect logically consistent with its aims to be constitutional." Williamson v. Lee Optical of Oklahoma, Inc., 348 U.S. 483, 487-88 (1955). Here, a justification for the Board's different standards exists, and that alone is sufficient to withstand constitutional scrutiny and, thus, to deserve the protection of qualified immunity. The plaintiffs' claim fails.

### D.     Plaintiffs' Commonwealth Claims

Plaintiffs allege violations of Law 139 and the Puerto Rico Constitution. (Docket No. 25 at 41.)

We have discretion to decline supplemental jurisdiction over the remaining Commonwealth law claims, since we have dismissed all of the claims over which we have original jurisdiction. See 28 U.S.C. § 1367(c)(3); see also United Mine Workers v. Gibbs, 383 U.S. 715, 726 (1966) ("if the federal law claims are dismissed before trial … the state claims should be dismissed as well). In exercising our discretion under § 1367(c), we must consider the issues of "judicial economy, convenience, fairness, and comity." Che v. Massachusetts Bay Transp. Authority, 342 F.3d 31, 37 (1st Cir. 2003). Having considered these factors, we decline to exercise supplemental jurisdiction over Plaintiffs' Commonwealth law claims, and we dismiss them without prejudice.

## IV.

## Conclusion

For the foregoing reasons, the defendants' motion to dismiss, (Docket No. 30), is **GRANTED**. The plaintiffs' federal law claims are **DISMISSED WITH PREJUDICE**. The plaintiffs' Commonwealth law claims are **DISMISSED WITHOUT PREJUDICE.**

**IT IS SO ORDERED.**

San Juan, Puerto Rico, this 30th day of August, 2013.

S/José Antonio Fusté
JOSE ANTONIO FUSTE
U. S. DISTRICT JUDGE